Fred A. Young, J.
On August 23, 1956, the State of New York pursuant to section 30 of the Highway Law appropriated, in fee, without right of access to and from the abutting property, some 9.764 acres of the claimant’s land located in the Town of Brighton, New York, by filing a map and description of said appropriated parcel in the office of the Clerk of Monroe County. Subsequently, on February 26, 1959, the State appropriated 1.372 additional acres from the same parcel of claimant’s land by filing a map and description of said appropriated property in the office of the Clerk of Monroe County. This taking was also pursuant to section 30 of the Highway Law and without right of access to and from the abutting property.
The first taking was the subject of Claim No. 34401 which was filed in the office of the Clerk of the Court of Claims and served on the Attorney-General January 16, 1957. The second taking is the subject of Claim No. 36622 which was filed in the office of the Clerk of the Court of Claims and served upon the Attorney-General on May 11, 1959. Before the initial appropriation the claimant’s property consisted of approximately 23 acres, situated on Allen’s Creek Road, Town of Brighton, Monroe County, New York. The westerly boundary of the aforesaid property was approximately 100 feet east of the intersection of Allen’s Creek Road and Monroe Avenue. The latter thoroughfare being a main thoroughfare leading from the City of Rochester southeasterly through the Towns of Brighton and Pittsford.
The 23-acre parcel had a frontage on Allen’s Creek Road of 319.61 feet, which highway provided the principal means of access to the property. Premises also fronted for approxi *268 mately 60 feet on Yalley Road on the north boundary of the property but use of this road as means of access to the proposed center was uncertain. The parcel was also traversed by Allen’s Creek, a stream from 15 to 30 feet wide and from 6 to 12 feet deep and which drained an area of approximately 7,400 acres in the Towns of Brighton and Henrietta. Subsequent to the first appropriation, a parcel approximately 10.615 acres in area, remained to the claimant at the northeast corner of its property. A second parcel of approximately 3 acres in area remained in the southwest portion of the original tract. The second appropriation took a parcel of 1.372 acres in area from the latter area leaving a parcel 1.7 acres in area, fronting 290 feet on Allen’s Creek Road, remaining.
The property originally was approximately 1,800 feet deep and 500 feet wide and generally rectangular in shape. It was bounded on the west by the abandoned Erie Canal, on the east by the Auburn Branch of the New York Central Railroad, on the north by Yalley Farm Subdivision and Yalley Farm Road. The land was generally level except for the creek and the embankment of an abandoned trolley line located on the west central portion of the site.
At the time of the appropriation the parcel was being developed as a shopping center. Grading of the land had commenced. Plans for construction had been prepared and conditionally approved by the State and local authorities. Prospective tenants had been contacted and a considerable number had indicated interest and intent to lease space in the proposed shopping center.
Upon the trial both the claimant’s and State’s expert appraisers agreed that the best available use for the property was as a shopping center. Although the State’s expert qualified this statement by stating that the property had certain limitations, basically, the experts were in agreement with respect to use. These experts were also practically in agreement with respect to the use of the two parcels remaining subsequent to the taking. Mr. Borchard for the claimant stated the 1.7-acre parcel could be used for a business not dependent on a constant flow of traffic and was worth approximately $10,000. Mr. Lum thought the site might be suitable for a small restaurant of the drive-in type; Mr. Wills, for the State, a commercial site or an apartment house site. All three gentlemen are in agreement that the after value of this parcel was $10,000.
With respect to the larger parcel, access to Yalley Road only remained. Mr. Borchard thought it would be suitable for *269 developing approximately 22 Class C lots, its value $5,000. Mr. Lum agreed. Mr. Wills agreed on the use hut believed its value as a subdivision would be $11,250. In view of the unanimity of opinion of the experts with respect to the best available use of the property and its value after the appropriation, the disparity in the value assigned to the premises before the appropriation by these gentlemen, all highly respected real estate appraisers, is rather startling. Mr. Borchard and Mr. Lum, both testifying for the claimant, agreed that the before appropriation value was $700,000. Mr. Wills appearing for the State testified to a pre-appropriation value of $103,500.
In the face of such diversity in expert opinion a detailed consideration of all pertinent facts herein is in order.
The original 23-acre parcel was conveyed by Bose D., Charles and Chris D. Musfeldt to John E. and Irma M. Keenan, on October 27, 1955. Bevenue stamp affixed to the deed indicated a consideration of not more than $20,000. On November 2, 1955, the Keenans granted an option to purchase or rent the same to one Leonard Tebor, as agent for a corporation to be formed. Purchase price was to be $100,000 or rental for 40 years at $1,000 per month net. Manner of payment of consideration in event of purchase was made dependent upon certain contingencies, not important herein. The option indicated the parties contemplated the construction of a shopping center on the site.
On November 7, 1955, the parcel, originally zoned residential, was rezoned commercial. Tebor thereafter interested one Emil Muller, president of Muller Construction Co., a man with a wealth of experience in the development and construction of shopping centers, in the project. The claimant corporation was organized in May, 1956 with 50 shares of stock going to Muller and 25 shares apiece to Tebor and to one Bernard Birnbaum.
Mr. Muller was elected president of the corporation at its first meeting on July 16,1956. Meanwhile, the option granted Tebor by Keenan was cancelled on March 13, 1956, and renegotiated. The new contract was assigned to and accepted by the claimant at the July meeting. The Keenans transferred the 23-acre parcel to the claimant on August 1, 1956, consideration being $100,000, $5,000 in cash and a $95,000 mortgage.
Clearing and grading the site began in August, 1956, and was halted by the appropriation. Up to this point claimant had expended $50,459.50 for plans and preparation of the site for the shopping center. This sum is entitled to consideration in determining the compensation due claimant herein. (Matter *270 of City of New York [Pelham Parkway Houses], 197 Misc. 70.) We do not believe that the State’s appraiser gave adequate consideration to this item in his appraisal.
The actual issuance of a building permit was halted by the appropriation. Although claimant’s plans had won only conditional approval by the proper authorities, there is nothing before us to show that any real deterrent existed which would ultimately prevent the utilization of the site as a shopping center.
There is no question that the Town of Brighton was a fast-growing residential suburb of the City of Rochester, and although a considerable number of retail stores and service businesses of various types were already established therein, the area was ideal for the shopping center contemplated by the claimant. Furthermore, the site was the only location in the Town of Brighton suitable for the erection of such a center because the zoning ordinances that existed on the date of the appropriation excluded any other commercial developments such as the instant project.
“ One whose land is taken by eminent domain is entitled to receive its greatest value for any available use to which it may be put. As bearing on such value, it is competent to show any fact which the owner would naturally and properly bring to the attention of a buyer with whom he was negotiating a sale. ’ ’ (Matter of City of Rochester [Smith St. Bridge], 234 App. Div. 583, 586.) We consider the parcel well adapted for the development of a shopping center. However, the project was terminated in its initial stages. No leases had been signed. (See Mattydale Shopping Center v. State of New York, 303 N. Y. 974.) Although a number of excellent prospective tenants had indicated an interest and possible intent to lease space in the completed center, the fact remains no leases were signed nor had financial arrangments been completed.
Upon the trial we refused to permit the claimant’s experts to capitalize expected earnings; we adhere to that ruling. (See Levitin v. State of New York, 12 A D 2d 6.) However, the valuations of the claimant’s experts were based on other methods and they testified that they used a capitalization method only to check the accuracy of their prior valuations. In view of this we gave consideration and weight to their testimony.
Mr. Muller also appeared as a witness for the claimant. He explained his method of developing shopping centers whereby the owners of the land were given a 50% interest in the enterprise, which, in effect, was the method he pursued in this instance. He further stated that he was so impressed with Brighton’s location that he would have put a million dollars *271 in land costs alone for the acquisition of so favorable a site. While Mr. Muller was an interested witness, we cannot disregard his experience in developing shopping centers nor the fact that he actually devoted his time and efforts to developing the site, a practical demonstration of his faith in the value of the site. Of course, we cannot consider Mr. Muller’s ability when we determine the valne of claimant’s land. (Matter of City of Rochester [Smith St. Bridge], supra; Banner Milling Co. v. State of New York, 240 N. Y. 533, 540.) We consider such ability only with respect to his competency as an expert witness.
There were two sales of the claimant’s entire property within a year of the date of the appropriation to which we have already alluded. We now turn to a consideration of these transactions. At the time of the transfer from the Musfeldts to the Keenans, the property was zoned as residential, hence, even the State’s expert does not consider this sale. When the Keenans transferred the property to the claimant, its use as a shopping center was contemplated and the change in zoning regulations, although not accomplished at the time of such transfer, was obviously expected by the parties. However, it is evident that the Keenans either lacked the means or inclination to exploit the full potentialities of the site and were obviously interested only in a quick profit from their transaction. On the other hand, the claimant not only appreciated the potential of the property but was actually in the process of developing it at the time the appropriation occurred. “It is axiomatic that in appraising land the fundamental question to be answered is ¡ what has the owner lost, not what has the taker g*ained ’ (Boston Chamber of Commerce v. Boston, 217 U. S. 189, 195 [1910]) and that an owner whose property is acquired by condemnation is not limited in compensation to the use which he made of his property but is entitled to receive its market value ‘ based on the most advantageous use ’ (United States v. Miller, 317 U. S. 369, 375; Sparkill Realty Corp. v. State of New York, 254 App. Div. 78, 82, affd. 279 N. Y. 656; Olson v. United States, 292 U. S. 246).” (St. Agnes Cemetery v. State of New York, 3 N Y 2d 37, 41.)
Fair market value is not the sum which the Keenans took for a quick profit but the price which claimant, or an owner in similar circumstances, would have taken from a willing buyer on August 23,1956. In view of this, we cannot consider the sale from the Keenans to Brighton as controlling.
Both claimant and State submitted lists of sales they considered comparable to the property in question (Court of Claims *272 Act, § 16; St. Agnes Cemetery v. State of New York, 3 N Y 2d 37, supra; Village of Lawrence v. Greenwood, 300 N. Y. 231.) The comparable sales listed by the claimant varied in size from .2 acre to 3.5 acres and were located on Monroe Avenue in the general vicinity of its intersection with Allen’s Creek Road. All of the aforesaid parcels were sold for business purposes for which direct access to a busy highway was an important if not essential factor. The average sale price was $35,643 per acre. The claimant’s experts admitted these properties were not comparable to the subject property, at least as far as size was concerned, since none of them were large enough for a shopping center. Another consideration is the fact that all of these properties were located on Monroe Avenue. However, despite these differences, both these experts considered the sales listed as illustrating land values for commercial property in the immediate area.
However, both Mr. B orchard and Mr. Lum in arriving at their estimates of the value of the subject property considered many other factors including sales of land for other shopping centers, population and growth of the area, existing stores, income and spending habits of local residents as well as the sales in question. These gentlemen made an extensive study of the area considering all the factors an informed prospective purchaser would consider before arriving at their conclusions, and hence we give considerable weight to their testimony.
The list submitted by the State contained two prior sales of the Brighton property. We have already discussed these sales. The other three sales listed involved the assembly of smaller parcels for ultimate use as a shopping center. None, however, consisted of a single large tract already zoned commercial and under development as a shopping center.
The first located on Ridge Road in the Town of Greece, Monroe County, involved six parcels which when assembled aggregated some 133 acres of which 43 acres were used for a shopping center. The State’s expert considered only these 43 acres and discounting remaining 90, arrived at a value of $4,442 per acre.
The second sale, located on Fairport Road, Town of Perinton, New York, consisted of five separate properties which when assembled comprised 14 acres, an average price of $5,200 an acre. The owners subsequently sold one acre of their tract for a gas station. The addition of this sale, $41,500 for the single acre, would raise the average price per acre to $7,635.
The third sale consisted of two properties on Dewey Avenue in the Town of Greece and consisted of 39.56 acres. The price was $2,060 per acre. However, this property was zoned resi *273 dential at the time of sale and some of it continued to be so zoned thereafter.
The testimony of the State’s expert was not too definite with respect to just when the parcels on his comparable list were rezoned commercial. However, it is apparent that at the time the sales were originally negotiated the properties were zoned residential. In some instances options were first taken and the property was subsequently rezoned commercial apparently before transfer, whereas the subject property was zoned commercial at the time of the taking. The State’s comparables differed from the instant property in another respect in that there is nothing to show such sites were the only available tracts in their localities. In fact, quite the contrary is evident from the fact that two of them were located in the same town. In addition thereto the State’s expert admitted there was considerable land available in town when these two parcels were assembled. He also admitted that the Fairport property involved the purchase of some back land. Neither party objected to the admission of the other’s lists of comparables into evidence, except one sale, an appropriation by the State, which we excluded. As a result, to quote Mr. Wills, the State’s expert, “ all sales are in the picture and, to some extent, must be considered. Whether or not you gave them much weight is the question.” So we consider all the sales to the extent they are similar to the subject property and weigh them accordingly.
There was no dispute that Allen’s Greek had to be relocated before a shopping center could be constructed and the cost of doing this work would be an item to be considered by a prospective purchaser. The parties disagreed only on the cost of doing this work. The State’s expert estimated the cost of the work to be $72,000 as of February, 1960. On the other hand, Mr. Muller contemplated a cost of $30,000 as of August, 1956 for such work. In view of his experience we consider Mr. Muller’s figure to be the more realistic one and have considered this in awarding damages herein.
We have also considered the fact that the site was not located directly on Monroe Avenue but on a side road adjacent thereto. We do not consider such location to be detrimental, for direct access to Monroe Avenue was not essential. There was also the problem of possible traffic congestion and the limited entrance on Allen’s Creek Road, lack of visibility from certain parts of Monroe Avenue, especially in the Summertime, and competition from the several stores and small shopping centers already existing in the area and the questionable probability of establishing a second entrance at Valley Road. All of these *274 factors were emphasized by the State’s expert. While we do not consider them to be as important as he did, we do not discount them entirely.
Both parties agree that the highest and best available use for the site from which the appropriations were made was as a shopping center. It was also the only available site in an ideal area for such an enterprise. The property was extremely unusual not only because of its size and location but also because it was the only vacant tract of such extent, in the immediate area, which was zoned for commercial use. (Katz v. State of New York, 10 A D 2d 164.) The claimant was indeed very fortunate in the manner in which the circumstances herein enhanced the value of the property — this we are willing to acknowledge. However, regardless of the circumstances, consideration must be given to the conditions existing in order to render the claimant just compensation. We have weighed the testimony of the experts as well as the factors considered herein and it is upon that basis we have arrived at a sum which we believe will compensate the claimant fairly for the loss of its property.
The major portion of claimant’s damages were sustained as a result of the initial appropriation which destroyed the usefulness of the site as a shopping center. The value of the premises before such appropriation was $386,850. The value after this appropriation was $21,936.
The value of the remaining portion of the claimant’s lands before the second appropriation was $21,936. The value of claimant’s land after such appropriation was $21,250.
Attached herewith and made part hereof is a description of that parcel of the claimant’s premises which was appropriated by the State of New York on August 23, 1956. Attached hereto and made part hereof is a description of that portion of the claimant’s premises which was appropriated by the State of New York on February 26,1959.
Under Claim No. 34401 the claimant is entitled to recover against the State of New York the sum of $364,914, with interest from August 23, 1956, up to and including the date of entry of judgment herein. The claimant is also entitled to recover the cost of appropriation maps attached to copies of the claim, to wit, the sum of $9.84. (Rules of Court of Claims, rule 25.)
Under Claim No. 36622 the claimant is entitled to recover against the State of New York the sum of $686, with interest from February 26,1959, to the date of entry of judgment herein.