John J. O’Brien, J.
These proceedings were brought under the Beal Property Tax Law to review the assessments of petitioners’ real properties in the City of Plattsburgh for the year 1963. They were tried together on August 3, 1964, through August 5, 1964. The matter w,as finally submitted on February 15,1965, when the last brief was received.
By stipulation of the parties, proceedings with respect to the ' same assessments made for the year 1964 were submitted to this court for decision on the basis of the record with respect to the 1963 assessments, and as additional evidence, that the premises of S. S. Kresge Company here involved were contracted to be sold on September 29, 1964 for. the sum of $75,000.
The property of petitioner S. S. Kresge Company (hereafter Kresge) is located at 10-12 Margaret Street, the main business street of the city, and has frontage of approximately 61.5 feet on Margaret Street. It is used by this petitioner as a retail variety store. The Assessors valued the property for the year 1963 as follows:
Land Buildings Total
$46,090 $36,340 $82,430
The property of F. W. Woolworth Company (hereafter Woolworth) is located at 14-18 Margaret Street and consists of an irregular shaped parcel of land having a frontage of approximately 91 feet on Margaret Street. It is improved with a ¡masonry type building used as a retail store. Woolworth purchased the property in 1949 for $285,960. The property had been assembled through the witness Parker Webb, petitioners’ expert, in 1940. The existing buildings had been demolished and the present structure erected in 1940. Title had been taken in *703 the name of Woolworth’s nominee who eventually conveyed it to Woolworth. The assessment for the year 1963 was as follows:
Land Buildings Total
$81,290 $119,740 $201,030
Each petitioner claims that the property has been overvalued and that each is entitled to a reduction in the assessment. It is conceded that the City of Plattsburgh assesses at 50% of true value.
For many years, Margaret Street had been the prime shopping street in the city, Commencing in 1958, three shopping centers with vast parking areas were opened. The first of these is the North Country Shopping Center located a short distance from the northern limits of Plattsburgh, on TJ. S. Boute 9. The second is the Plattsburgh Plaza Shopping Center on Boute 3, the main highway to the west, within the city. The third is the Sky Way Center located directly across from the TJ. S. Air Force Base on TJ. S. Boute 9.

Each of the shopping centers referred to had parking spaces for many oars, the Plattsburgh Plaza having space for 960 cars, the Sky Way for 1,100, and the North Country for 1,800.
Margaret Street had no free parking and what was available was either metered curb parking or four private pay lots which were not conveniently located. Curb and private lots altogether provided 274 spaces.
Petitioners’ experts and even Mr. Wolfe, chairman of respondent board, attributed the decreasing volume of business done by *704 their stores mainly to the presence of the shopping centers with their large parking areas.
None of the experts used sales of other properties in the vicinity as a basis for valuation because there were no such comparable sales. Similarly, none could use the capitalization of income method of valuation, except to the extent that it was done by petitioners’ expert Parker Webb, and respondent’s expert Thomas Birmingham, as hereinafter explained, because neither of the properties was held for the purpose of providing income for their owners. Consequently, the principal method used was the reproduction-cost-less-depreciation method. A comparison of these valuations follows:

Mr. Clute took into consideration the' lack of parking, the development of the shopping centers with their large parking areas, the steady decrease in gross sales volume, the fact that the Kresge store was too small to be used as a variety store in its present location and economic obsolescence.
Mr. Birmingham, respondent’s appraiser did not take into consideration the decreasing sales in the downtown area, and in particular, the decreasing sales of petitioners’ stores, although he had been told by the Chairman of the Commission of Assessment, Abraham Wolfe, who also operated a retail store in the downtown business area that sales were decreasing. He did not take into consideration economic obsolescence and gave no effect to the lack of parking facilities.
Abraham Wolfe testified that Margaret Street had declined within the last three years, that the presence of the shopping centers and the competition from the stores in them had an effect, and that business had dropped to the extent of 50%.
Economic obsolescence is loss of value brought about by conditions that environ a structure, such as a declining location or the downgrading of a neighborhood resulting in reduced business volume. (Friedman, Encyclopedia of Real Estate *705 Appraising, pp. 49, 50; McMichael’s Appraising Manual [4th ed.], p. 51.)
Mr. Birmingham testified that he checked his values by using a capitalization of net rental expectancy, by assigning a rental value of $1.85 per square foot. This figure was subjectively determined to be “ fair ” and was not based on any factual evidence in the record.
Parker Webb, petitioners’ second expert, had wide experience in appraising for a great many of the national chain variety stores. Representing many of these national chains, he testified that over the years, real estate appraisers for these chains determined the fair market value of properties owned by them on the basis of an adequate percentage of its annual sales, that variety chains pay a rental of 5% of gross annual sales on existing locations and 4% on new stores, and that all leases made for many years to Kresge, Woolworth, Seans, etc. have been made on the basis of a minimum annual rental of 5% of gross annual sales. He then evaluated the Kresge property, using a rental of 5% of gross sales, which for 1963 was in round figures $125,000, producing a fair rental of $6,250. He allocated against that insurance expense of $274, leaving a net annual rental of $5,976. He thereupon capitalized that at 10.75% — 6% for return of capital investment, 2% for depreciation and obsolescence, and a tax factor of 2.75%. That produced a market value of $55,600 or $56,000 in round figures, plus $4,000 for a right of way for a total of $60,000. He also made a similar appraisal, using the average yearly gross sales for a period of three years, because he felt that since sales were declining so rapidly, it was unfair to take gross sales for the lowest year. On that basis, he arrived at a fair market value of $74,000. The closeness of this valuation to the price of $75,000 in the contract of sale of September 29, 1964 is striking.
Using the same method for the Woolworth property, he arrived at a value of $200,000 if the gross sales for 1963 only were used, and $240,000 if the average three-year gross sales were used.
The testimony of Parker Webb was admitted over the objection of respondent.
No one questions that the cost of reproduction less depreciation values are acceptable, and, in fact, such values fix the upper limit of value (Matter of Mid-Island Shopping Plaza v. Podeyn, 25 Misc 2d 972, affd. 14 A D 2d 571, affd. 10 N Y 2d 966). The failure of respondent’s appraiser to give effect, *706 among other items, to economic obsolescence impressed me adversely. There were other flaws in his evaluations that influenced me to give more credit to the valuations of petitioners’ experts.
The best method of valuation is by capitalization of the fair rental value (People ex rel. Gale v. Tax Comm, of City of N. Y., 17 A D 2d 225, 230).
That was done here by Parker Webb. Respondent contends that when he used the gross annual sales of the stores, he was using income to determine value. Income and profit are improper items to consider in determining value (Levitin v. State of New York, 12 A D 2d 6; Brighton Plaza v. State of New York, 32 Misc 2d 266). However, the gross sales figures are not income. The question of the use of a percentage of gross sales figures to determine fair rental value and fair value is one of first impression in this State.
The subject was touched on in Matter of Putnam Theatrical Corp. v. Gingold (16 A D 2d.413, 416-417), where the court said: “Petitioner’s expert has assumed income of the theatre from a possible lease thereof at a rent of 12% of the admission revenue. Assumption of such a lease is not based on any lease in the Syracuse area but -only on hearsay evidence of a lease in Washington, D. O., one in Cedar Rapids, Iowa, and another in Columbus, Ohio. In any event the assumed lease based on a percentage of admission revenue would depend in part on management and for that reason would not be a proper basis for the capitalization appraisal ”.
In that case there was no reference in the evidence to the fact that theatres customarily were leased on the basis of a percentage of admission revenues. The expert merely assumed hearsay evidence of such leases in three remote areas.
Here Mr. Webb testified that the basis for leasing stores to the national retail chains is a percentage of 4 or 5% of gross annual sales. The industry’s method of valuation deserves consideration by the courts.
Evidence of values derived in a similar manner was considered and approved in valuing gasoline service stations. Thus, in St. Louis Housing Auth. v. Bainter (297 S. W. 2d 529, 531 [Mo.]), the court said: “The testimony of Meyer Kopolow, a qualified witness ¡and the president of .the respondent company, tended to show that there was a standard formula in' the oil business by* which the fair market value and the reasonable rental value of a station was determined. He said the customary standard in the industry for determining the lowest possible selling or purchasing price of a station was the equiva *707 lent of one dollar per gallon ‘ pumped ’ at the station on the average per month; and that, if a station was averaging 50,000 gallons per month, the minimum purchasing or selling price would be $50,000. His testimony further tended to show that in leasing such service stations, operators and owners of major oil stations, applied a formula in determining reasonable rental value; and that the minimum rental was usually fixed at one cent per gallon per month of gasoline sold on the premises, although the rental was sometimes higher. * * * He said the primary factor in determining the fair market value of a service station or its reasonable rental value was 1 the volume of business or gallonage which has been sold in that station in the past.’ ”
Identical evidence was accepted as proof of value of gasoline service stations in State v. Hudson Circle Serv. Center (46 N. J. Super. 125) and State v. Ellis (382 S. W. 2d 225, 234). As Nichols, Eminent Domain, points out (vol. 5, § 19.3 [1], p. 348) in discussing this type of evidence, it is presented on the theory that the amount of money paid as rent on the basis of gallonage does not come under the ban of testimony referable to business profits, but that it is, in view of the prevalent practice, evidential of the rental value of the premises.
There is no difference between such method of valuing service stations and the method of valuing retail chain stores testified to by Parker Webb. If the gallonage method of valuation is evidence, so is the percentage of gross annual sales. If it is evidence of value to the retail chains, then it is also evidence of value to the courts, which must keep up with trends in business.
Accordingly, consideration is given to the values of Parker Webb, and to those of Bennett Clute. In view of the reduction sought by each of petitioners, it would be sufficient to sustain them if only the evidence of Mr. Clute is considered.
Petitioner Kresge claims that the full value of the property as of July 1, 1963, was $125,000. That figure is well over the valuations of its appraisers. However, it is within the range of the expert testimony and I therefore find such values. Applying the 50% equalization rate agreed upon, the correct assessment should be $62,500. The present assessed value is over the true value by $19,930, and petitioner Kresge is entitled to judgment of an overvaluation of $19,930.
Petitioner Woolworth claims a full value of $300,000 on July 1, 1963. That figure is also well over the valuations of its appraisers. However, it is within the range of the expert testimony and I therefore find such value. Applying the 50% *708 equalization rate, the correct assessment is $150,000. I find an overvaluation of $51,030, and petitioner Woolworth is entitled to judgment of an overvaluation of $51,030.
I make the same findings with respect to the 1964 assessments.